UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

RAFAEL SEBASTIAN MARCO
OLIVERA,

        Petitioner,

    v.

WARDEN MATTHEW MORDANT,
KELEI B. WALKER, SECRETARY
KRISTI NOEM, ATTORNEY
GENERAL PAMELA BONDI,
TODD LYONS, CHARLES PARRA,
KEVIN GUTHRIE,

        Respondents,

        Case No. 2:26-cv-547-KCD-NPM

## **ORDER**

Petitioner Rafael Sebastian Marco Olivera is a Venezuelan citizen subject to a final order of removal dating back to 2010. Because that order could not be executed, the Government released him on supervision. He later secured Temporary Protected Status. For sixteen years, Olivera remained in the community under his supervision order while the Government left his deportation undisturbed.

But on February 23, 2026, the Government changed course. Armed with a new strategy to deport him to a third country, U.S. Immigration and Customs Enforcement ("ICE") revoked his supervised release and placed him in custody. Olivera now petitions for a writ of habeas corpus, arguing that his

sudden confinement violates the protections of his Temporary Protected Status, the Due Process Clause, and the Administrative Procedure Act. (Doc. 1.)[1] The Government replies that it is simply doing its job: holding a removable noncitizen for a brief, presumptively reasonable period while it finalizes his deportation. (Doc. 11.) The Government has the better of the argument. Because Olivera's protected status has expired, and because his brief stint in custody sits within constitutional and statutory bounds, his petition must be denied.

## I. Legal Framework

The federal habeas statute, 28 U.S.C. § 2241, provides authority to issue writs of habeas corpus when an individual is "[i]n custody in violation of the Constitution or law or treaties of the United States." *Id.* § 2241(c)(3). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). "Section 2241 authorizes federal courts to hear challenges to immigration detention." *Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *2 (S.D. Fla. Sept. 9, 2025).

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

## II. Discussion

The analysis begins, as it must, with the Government's jurisdictional challenge. The Government claims that two provisions of the Immigration and Nationality Act—8 U.S.C. §§ 1252(g) and 1252(b)(9)—preclude federal review. (Doc. 11 at 3-5.) This Court has already addressed these arguments and rejected them for the same reasons they fail today. *See Obando-Vargas v. Assistant Dir.*, No. 2:26-CV-265-KCD-NPM, 2026 WL 796804, at *1-2 (M.D. Fla. Mar. 23, 2026). Section 1252(g) forecloses judicial review of just three discrete actions by the Attorney General, and challenging the procedural mechanics of detention is not one of them. *Id.* Likewise, § 1252(b)(9) "only affects cases that involve[] review of an order of removal." *Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1257 (11th Cir. 2020). Because Olivera is challenging his physical confinement rather than asking this Court to relitigate his underlying removal order, this statute poses no obstacle to our review. With that jurisdictional underbrush cleared away, we turn to the merits.

### A. TPS (Count One)

Olivera begins with a straightforward statutory command: under federal law, the Government cannot detain a noncitizen who holds Temporary Protected Status ("TPS"). *See* 8 U.S.C. § 1254a(d)(4). Because he

believes he remains a TPS beneficiary, he argues his ongoing confinement violates the Immigration and Nationality Act ("INA"). (Doc. 1 at 25.)

The TPS program allows the federal government to grant temporary protected status to a national of a foreign state in designated cases of ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions that prevent safe return. 8 U.S.C. § 1254a(b)(1). Congress enacted the TPS statute "out of concern that the forced repatriation of these individuals could endanger their lives or safety." H.R. Rep. 100-627, at 6 (1988). Under 8 U.S.C. § 1254a(a)(1)(B), the Attorney General may designate a country for TPS and grant nationals of that country protection from removal, as well as work authorization in the United States for the period their home country is designated under the program. The statute also indicates that, periodically, the Secretary "shall review the conditions in the foreign state ... for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3). In the event the Attorney General finds that the country no longer merits TPS designation, she "shall terminate the designation by publishing notice in the Federal Register of the determination." *Id.*

On September 8, 2025, then-Secretary of Homeland Security Kristi Noem published a notice in the Federal Register terminating TPS status for

Venezuela. The termination became effective on November 7, 2025—sixty days after publication of the notice, the shortest allowable transition period allowed by the statute. *See* https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-venezuela (last visited Apr. 23, 2026).

It is true that Olivera once held TPS. But his protected status facially expired on September 10, 2025. (Doc. 1-2 at 18.)[2] When that day came and went, his status went with it. While Olivera apparently filed a renewal application before the program was terminated (Doc. 1 at 14 n.4), that extension was never approved (Doc. 11 at 9). A pending application does not confer TPS status or its attendant protections against detention. *See Dassas v. Mordant*, No. 2:26-CV-247-JES-DNF, 2026 WL 653686, at \*1 (M.D. Fla. Mar. 9, 2026). Because it seems the Government never actually approved his renewal application, Olivera cannot claim the benefit of a TPS extension. He is, in short, asking the Court to enforce a legal status he does not actually hold. *See Ceballos* v. *Hardin*, No. 2:26-CV-00658-SPC-NPM, 2026 WL 911295, at \*2 (M.D. Fla. Apr. 3, 2026) (finding Venezuelan petitioner did not gain the benefit of a TPS extension when the government did not grant the application).

---

[2] For ease of reference, the Court cites to the page numbers generated by its electronic filing system for all exhibits.

Olivera tries to sidestep this expiration problem by pointing across the country to a district court in California. (Doc. 1 at 4.) In *National TPS Alliance v. Noem*, that court declared the Secretary's termination of the Venezuelan TPS program unlawful. 798 F. Supp. 3d 1108 (N.D. Cal. 2025). Olivera proffers that because the termination was declared invalid, his TPS magically springs back to life. (Doc. 1 at 4.) But that argument ignores the Supreme Court's intervention, which stayed the California court's order "pending the disposition of the Government's appeal." *Noem v. Nat'l TPS All.*, 146 S. Ct. 23, 24 (2025). And even if we brush past the stay, the California litigation cannot do the heavy lifting Olivera asks of it. A court order enjoining the termination of a nationwide program does not retroactively resurrect an individual status that lapsed months earlier. By the time the Secretary ended the program—and certainly by the time the California district court weighed in—Olivera's TPS had expired on its own terms. The *National TPS Alliance* decision might keep the door open for those who still hold a valid status, but it does not reach back in time to rescue someone whose protection had already run out. *See, e.g.*, *Perez v. Schmidt*, No. 26-CV-0158-BHL, 2026 WL 867765, at \*5 (E.D. Wis. Mar. 30, 2026); *see also Pirela-Altamar v. Raycraft*, No. 1:26-CV-388, 2026 WL 820371, at \*3 (W.D. Mich. Mar. 25, 2026) ("At this time, based on the procedural history of *National*

*TPS Alliance v. Noem*, this non-binding case does not affect the Court's analysis in this habeas action.").

Olivera has failed to show that he currently has TPS or that he had TPS when taken into ICE custody. So his claim attacking his detention under § 1254a(d)(4) must be rejected.

## B. Substantive Due Process (Count Two)

A noncitizen subject to a final order of removal, like Olivera, has no inherent right to walk free while awaiting deportation. "Detention during deportation proceedings" is simply "a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). But there is a catch. Holding a removable alien indefinitely is a constitutional non-starter because "the Due Process Clause applies to all persons within the United States." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

To reconcile these points, the Supreme Court in *Zadvydas* capped "an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." *Id.* at 689. And to give lower courts a workable yardstick, the Court drew a line at six months: any post-removal detention lasting six months or less is "presumptively reasonable." *Id.* To have a substantive due process claim in this context, then, "the alien not only must show post-removal order detention in excess of six months but also must provide evidence of a good reason to believe that there

is no significant likelihood of removal in the reasonably foreseeable future." *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002).

Apply that framework here, and Olivera's due process claim immediately runs into a math problem: he has not been detained nearly long enough. ICE took him into custody on February 23, 2026. Because his confinement remains well short of the six-month mark, he sits squarely within the presumptively reasonable window. *See Guerra-Castro v. Parra*, No. 1:25-CV- 22487, 2025 WL 1984300, at *4 (S.D. Fla. July 17, 2025) (finding habeas petition "premature" because "Petitioner has not been detained for more than six months"); *see also Jiang v. Mukasey*, No. 208-CV-773-FTM-29DNF, 2009 WL 260378, at *2 (M.D. Fla. Feb. 3, 2009); *Noel v. Glades Cnty. Sheriff*, No. 2:11-CV-698-FTM-29, 2011 WL 6412425, at *2 (M.D. Fla. Dec. 21, 2011).

Olivera spends many pages explaining that his removal is not reasonably foreseeable. But this argument puts the cart before the horse. Until the six-month *Zadvydas* period concludes, detention is presumptively reasonable, and any substantive due process claim is not ripe. *See, e.g., Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 1895479, at *8 (S.D. Fla. July 8, 2025); *Lopez v. Dir. of Enf't & Removal Operations*, No. 3:25-CV-1313-JEP-SJH, 2026 WL 261938, at *12 (M.D. Fla. Jan. 26, 2026).

Olivera also seems to argue that the Government's decision to revoke his supervision and return him to custody is a standalone substantive due process violation. (Doc. 1 at 26.) But that argument rests on a faulty premise. There is no substantive right to remain free on an order of supervision. Release on an order of supervision is a matter of administrative grace born of logistical necessity, not a permanent constitutional entitlement. Olivera assumes that as long as he complies with his conditions and stays out of trouble, the government's hands are tied. But the core purpose of post-removal-order detention is to effectuate the removal order. When the government determines that circumstances have changed—like charting a new path to remove Olivera to Mexico—it has the statutory and regulatory authority to revoke his supervision and finish the job, regardless of his prior compliance. *See* 8 C.F.R. §§ 241.4(l), 241.13(i).

Because immigration detention is a civil tool rather than a criminal penalty, the constitutional line is generally drawn at punishment. *See Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th Cir. 1981). By contrast, the Government can lawfully hold a noncitizen to ensure they are present for removal or to keep the public safe. That is simply the machinery of the immigration system doing its job. A substantive due process violation happens only when that machinery breaks down—when the detention loses its reasonable connection to effectuating a removal order and morphs into a

9

penalty. *Cf. Lee v. Stone*, No. 2:11-CV-00014-RWS, 2011 WL 4553147, at *7 (N.D. Ga. Aug. 25, 2011). So long as the custody serves a legitimate immigration purpose rather than acting as a punitive measure, it stays on the right side of the Constitution. *See, e.g., United States v. Salerno*, 481 U.S. 739, 747 (1987); *Rodriguez v. Perry*, 747 F. Supp. 3d 911, 917 (E.D. Va. 2024) ("[A]liens . . . have a substantive due process right to be free of arbitrary confinement pending deportation proceedings.").

Olivera cannot show that his current stint in custody is a punishment masquerading as immigration processing or is otherwise arbitrary. He is subject to a final removal order. The INA explicitly authorizes a return to detention to effectuate such orders. Under the rules, ICE may revoke a noncitizen's release to effectuate removal. 8 C.F.R. § 241.13(i)(2). And the Government no doubt has a legitimate interest in doing exactly that— enforcing its laws, ensuring individuals do not flee, and protecting the public. *See Malam v. Adducci*, 469 F. Supp. 3d 767, 790 (E.D. Mich. 2020). Here, ICE revoked Olivera's release specifically to enforce his outstanding removal order. Returning him to custody thus serves a recognized, legitimate government objective, and his substantive due process claim fails.

## C. Procedural Due Process (Count Three)

Olivera turns next to the procedural mechanics of his re-detention. He complains that ICE locked him back up without providing adequate notice or a meaningful opportunity to be heard. (Doc. 1 at 28.)

The Constitution, of course, demands that before the government strips a person of a protected liberty interest, it must provide fair notice and a meaningful opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976). But due process is flexible. It "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

In the context of revoking a noncitizen's supervised release, ICE's regulations strike that constitutional balance by guaranteeing written notice and an informal interview that allows the individual to respond. *See* 8 C.F.R. § 241.13(i).[3] These guardrails are undoubtedly sufficient considering the interests at play. And Olivera offers no authority to the contrary. *See Valdes-Santovenia v. Ripa*, No. 2:25-CV-01063-JES-DNF, 2025 WL 3771264, at *3 (M.D. Fla. Dec. 31, 2025); *cf. Daniels v. Tampa Police Dep't*, No. 8:25-CV-01529-WFJ-AEP, 2025 WL 2959658, at *3 (M.D. Fla. Oct. 20, 2025)

---

[3] As best the Court can tell, the Government previously released Olivera after determining that there was no significant likelihood of his removal. So the regulation governing his return to custody here is 8 C.F.R. § 241.13(i). *See Choy v. Woosley*, No. 4:25-CV-197-DJH, 2026 WL 324601, at *3 (W.D. Ky. Feb. 6, 2026). Olivera also cites § 241.13 as the applicable regulation. (Doc. 1 at 10.)

("[P]rocedural due process guarantees fair procedure and requires notice and an opportunity to be heard before any governmental deprivation of a [constitutionally-protected] interest.").

Take notice first. According to the immigration records on file, ICE provided Olivera with written notice of the revocation on February 23, 2026—the very day he was detained. (*See* Doc. 11-1 at 12-13.) The paperwork identified the agency's decision and its underlying rationale—to effectuate his removal. (*Id.* at 12.)

Then comes the opportunity to be heard. The records also show that ICE sat Olivera down for an informal interview that same day to discuss his return to custody. (*Id.* at 15.) Olivera complains that the Government's evidence of an informal interview is simply too thin. Pointing to the absence of a sworn officer declaration confirming he was told the reasons for his revocation and given a chance to respond, he argues his due process rights were violated. But that argument gets the law exactly backwards. In a habeas proceeding, the Government does not bear the burden to definitively prove its administrative perfection. Instead, the burden falls squarely on the petitioner to affirmatively show that his custody violates the Constitution or federal law. *See* 28 U.S.C. § 2241(c)(3); *Whitfield v. U.S. Sec'y of State*, 853 F. App'x 327, 329 (11th Cir. 2021). And here, Olivera has done nothing to carry that burden. Tellingly, he never actually denies that the informal interview

12

took place, nor does he claim he was kept in the dark about why his release was revoked. He simply suggests the Government needed to produce more paper to prove its case.

Because Olivera offers no evidence to rebut the Government's account (such as an affidavit filed under the penalty of perjury) he gives this Court no reason to second-guess the agency's actions. Official actions carry a presumption of regularity, and "where the contrary is asserted it must be affirmatively shown." *Lewis v. United States*, 279 U.S. 63, 73 (1929). By merely critiquing the Government's evidentiary submission rather than disputing the underlying facts, Olivera fails to show a procedural due process violation.

Olivera also insists his revocation is invalid because the wrong official signed the paperwork. Relying on 8 C.F.R. § 241.4, he argues that only a handful of high-ranking ICE officials—like the Executive Associate Director—have the power to yank someone off supervised release. (Doc. 12 at 8.)

But Olivera is reading the wrong part of the rulebook. He is trying to borrow strict procedural hurdles from one regulation and wedge them into his case. Because the Government previously released him after determining there was no significant likelihood of his removal, his return to custody travels on a different track entirely: 8 C.F.R. § 241.13. *See Choy,* 2026 WL

324601, at *3. And here is the catch: unlike its counterpart, § 241.13 contains no rigid signature mandate limiting revocation authority to specific executives. Because the agency operated under the correct regulatory framework, Olivera's complaint about the signature line falls flat.

In the end, Olivera has failed to show a procedural due process violation tied to the revocation of his release. The Government gave him the why and the when, which is all the regulations require. But even if we were to spot him a procedural foul—a missing signature, a sloppy citation, or a truncated explanation—that still would not unlock his cell door. The writ of habeas corpus is a profound remedy, not a penalty for bureaucratic typos. *Munaf v. Geren*, 553 U.S. 674, 693 (2008) ("The habeas statute provides only that a writ of habeas corpus 'may be granted,' and directs federal courts to 'dispose of [habeas petitions] as law and justice require.'"). Even if the agency's initial administrative process was somehow lacking, Olivera can hardly complain that he is being denied a meaningful opportunity to be heard *now*. Through this very habeas proceeding, he has had a full chance to review the Government's evidence, file his briefs, and press his legal arguments before an Article III court. He has had his say. Because this litigation itself has provided him with the exact procedural safeguards he claims to have missed, the Court declines to use the extraordinary tool of habeas relief to simply wipe the slate clean. "Because habeas is not backward-looking, the

14

process provided now renders forward-looking relief separately inappropriate." *Ladak v. Noem*, No. 1:25-CV-194-H, 2025 WL 3764016, at *5 (N.D. Tex. Dec. 30, 2025).

### D. Administrative Procedure Act (Counts Four, Five, and Six)

Olivera brings several claims under the APA. The difficulty here is twofold. First, he has alleged these claims in a habeas petition, which is the wrong vehicle for the job. The writ of habeas corpus exists to challenge the fact or duration of physical confinement. It is not a catch-all funnel for standard administrative grievances. Trying to shoehorn a freestanding APA challenge into a habeas petition simply does not work. *See Fleurimond v. Noem*, No. CV-26-00037-PHX-MTL (CDB), 2026 WL 507542, at *3 (D. Ariz. Feb. 24, 2026). A habeas petition comes with a streamlined procedure, fast-tracked rules, and a nominal filing fee. An APA challenge, by contrast, is a standard civil action with a heftier filing fee and following the ordinary, more deliberate pace of the Federal Rules of Civil Procedure. Litigants cannot sidestep those standard requirements by simply slapping a habeas label on an administrative complaint. *See Alvarez v. Noem*, No. 5:26-CV-0013-JKP, 2026 WL 93972, at *7 (W.D. Tex. Jan. 9, 2026); *Richmond v. Scibana*, 387 F.3d 602, 606 (7th Cir. 2004) (recognizing legal distinction between habeas cases and civil actions brought under APA, which have different filing fees and exhaustion provisions).

Second, the APA itself leaves no room for such claims. The APA operates as a fallback option, providing a right of judicial review only when "there is no other adequate remedy in a court." 5 U.S.C. § 704. But Olivera has an adequate remedy—the very habeas petition he filed to get through the courthouse doors. *See Trump v. J.G.G.*, 604 U.S. 670, 674 (2025) (Kavanaugh, J., concurring). Because the writ of habeas corpus provides a fully adequate avenue to test the legality of his custody—which is the only thing Olivera is challenging here—the APA simply leaves no room for these redundant claims. *See Fleurimond*, 2026 WL 507542, at *3; *Rivera v. Noem*, No. 1:25-CV-01289 KWR-KBM, 2026 WL 381309, at *7 (D.N.M. Feb. 11, 2026).

### E. Ultra Vires (Count Seven)

In his penultimate claim, Olivera declares that no law authorizes his detention and asks the Court to "enjoin Respondents' ultra vires actions." (Doc. 1 at 36.) But he offers no facts, cites no law, and provides no analysis to explain why ICE's actions supposedly fall outside its statutory authority. A petitioner cannot just drop a legal label on the table and expect the dots to connect themselves. In our adversarial system, a party has to do the heavy lifting of framing the issues for decision. *See United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022). The Court will not do that work for him, and so this claim is also rejected.

16

### F. Accardi Doctrine (Count Eight)

Olivera plays his final card by invoking the *Accardi* doctrine—the foundational administrative law principle that an agency must follow its own rules. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). He argues that ICE violated its regulations and internal instructions when it revoked his release. (Doc. 1 at 36-37.) But this argument simply recycles the procedural complaints rejected above under a different legal label. As explained, ICE *did* follow the applicable rulebook. The agency properly relied on 8 C.F.R. § 241.13 to revoke his supervision and effectuate his removal, providing the required notice and an informal interview along the way. Because there was no regulatory breach on the record provided, the *Accardi* claim also collapses.

### III. Conclusion

Olivera has not been detained long enough to transform his authorized custody into a due process violation under *Zadvydas*. And his remaining arguments—whether grounded in administrative technicalities or the like—do not warrant habeas relief. The Government is actively working to execute his removal, and it has cleared the necessary regulatory hurdles to keep him in custody while it does so. Because his current detention remains lawful, the Petition for Writ of Habeas Corpus is **DENIED WITHOUT PREJUDICE**.

The Clerk is **DIRECTED** to enter judgment accordingly, terminate any pending motions, and close the case.

**ORDERED** in Fort Myers, Florida on April 24, 2026.

Kyle C. Dudek
United States District Judge